# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RICKY LEE HAYES,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:13cv00018 |
| | ) | **MEMORANDUM  OPINION** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Ricky Lee Hayes, ("Hayes"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012).  Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

Case 2:13-cv-00018-PMS   Document 20   Filed 08/26/14   Page 1 of 33   Pageid#: 738

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hayes protectively filed his applications for SSI and DIB on August 22, 2008, alleging disability as of July 26, 2008, due to arthritis in the lower back and hips, pain in the back and hips, breathing problems, hemorrhoids and degenerative bone disease in the back and hips. (Record ("R."), at 226-29, 232-33, 256, 267.) The claims were denied initially and upon reconsideration. (R. at 63-94, 95-122, 127-32, 134, 137-38, 140-41.) Hayes then requested a hearing before an administrative law judge, ("ALJ"). (R. at 143-44.) Two hearings were held on Hayes's claims. One was held on February 16, 2011; the other was held on November 15, 2011. (R. at 27-48.) Hayes was represented by counsel at both hearings. (R. at 27, 32.)

By decision dated December 30, 2011, the ALJ denied Hayes's claims. (R. at 14-26.) The ALJ found that Hayes met the disability insured status requirements of the Act for DIB purposes through December 31, 2011.[1] (R. at 17.) The ALJ found that Hayes had not engaged in substantial gainful activity since July 26, 2008. (R. at 17.) The ALJ found that the medical evidence established that Hayes had severe impairments, namely degenerative disc disease, degenerative joint disease, chronic obstructive pulmonary disease, ("COPD"), major depressive

---

[1] Therefore, Hayes must show that he became disabled between July 26, 2008, the alleged onset date, and December 31, 2011, the date last insured, in order to be entitled to DIB benefits.

Case 2:13-cv-00018-PMS   Document 20   Filed 08/26/14   Page 2 of 33   Pageid#: 739

disorder, borderline intellectual functioning and anxiety disorder, but the ALJ found that Hayes did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.) The ALJ found that Hayes had the residual functional capacity to perform simple, unskilled light work[2] that required no concentrated exposure to fumes, odors, gases, dust and poor ventilation, no exposure to hazards, only superficial contact with others and low-stress work, which was defined as no high production quotas or strict time demands for production. (R. at 19-25.) The ALJ found that Hayes was unable to perform any of his past relevant work. (R. at 25.) Based on Hayes's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Hayes could perform, including jobs as a cleaner, a mail clerk, a packer and a counter clerk. (R. at 25-26.) Thus, the ALJ concluded that Hayes was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

After the ALJ issued his decision, Hayes pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-3.) Hayes then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). This case is before this court on Hayes's motion for summary judgment filed December 23, 2013, and the Commissioner's motion for summary judgment filed January 27, 2014.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2013).

## II. Facts

Hayes was born in 1962, (R. at 63, 226, 256), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Hayes attended school into the eleventh grade, but his school records showed that he failed numerous high school courses. (R. at 327.) According to Hayes, he has obtained his General Equivalency Development, ("GED"), diploma. (R. at 330, 346.) Hayes has past work experience as an underground coal miner. (R. at 330, 346.) Hayes testified at his 2011 hearing that his pain, depression and anxiety had worsened since he was denied benefits on a prior application in 2008. (R. at 36, 39.) Hayes stated that he experienced pain throughout his back, in his hips and in his knees. (R. at 36.) Hayes admitted that he took Lortab for pain and that it helped some. (R. at 37.) Hayes also stated that he had trouble breathing. (R. at 36.)

Hayes testified that he could walk for five to 10 minutes before he would be forced to stop. (R. at 37.) Hayes also stated that he could sit for only 10 to 15 minutes before the pain would force him to stand up and move around. (R. at 38.) Hayes also testified that he had difficulty gripping and lifting items with his hands. (R. at 38.)

Robert Jackson, a vocational expert, also was present and testified at Hayes's November 15, 2011 hearing. (R. at 42-46.) He classified Hayes's past work as a coal miner/laborer as medium[3] to heavy[4]. (R. at 43-44.) The ALJ asked

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

Jackson to consider a hypothetical individual of Hayes's age, education and work experience, who could occasionally lift, carry and/or upwardly pull items weighing up to 20 pounds and frequently lift, carry and/or upwardly pull items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, occasionally climb ramps, stairs, ladders, ropes and scaffolds, occasionally balance, stoop, kneel, crouch and crawl and who must avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation, as well as hazards such as dangerous moving machinery and unprotected heights. (R. at 44.) The ALJ also asked Jackson to assume that this individual was limited to simple, easy-to-learn unskilled work with only superficial contact with the public, co-workers and supervisors and who should be in a low-stress job, which was defined as a job with no high production quotas or strict time demands for production such as assembly line type of work. (R. at 45.)

Jackson testified that a significant number of jobs existed that such an individual could perform, including jobs as a cleaner, a mail clerk, a packer, and a counter clerk, all at the light unskilled level. (R. at 45-46.) Jackson also testified that there would be no jobs available for a hypothetical individual who had no ability to follow work rules, who would be absent from work more than two days a month or who would have poor or no ability to demonstrate reliability. (R. at 46.)

---

[4] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2013).

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Norton Community Hospital; Mountain View Regional Medical Center; Stone Mountain Health Services; William J. Hamil, M.Ed., LSPE; Wise County Behavioral Health Services operated by Frontier Health; Howard S. Leizer, Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Richad Surrusco, M.D., a state agency physician; Dr. William Humphries, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Edward E. Latham, Ph.D., a clinical psychologist.

The medical records show that Hayes was diagnosed with COPD as early as 2001. (R. at 358.) It also shows that Hayes has complained of chronic low back pain for years. (R. at 371, 374, 376, 403, 405-14.) A bone scan performed on Hayes's cervical, thoracic and lumbar spine, anterior chest, shoulders and hands revealed mild increased uptake in the right acromiocalvicular, ("AC"), joint and left first metacarpal phalangeal joint, most likely due to arthritic changes in these joints. (R. at 364.) An MRI of Hayes's cervical spine performed on September 27, 2001, revealed normal results except for a mild disc bulge in the midline at the C5-C6 level resulting in slight effacement of the thecal sac anterior to the spinal cord with slight narrowing of the neural foramen on the left side at this level. (R. at 362.) An MRI of Hayes's left shoulder taken the same day revealed mild to moderate arthritic changes in the AC joint and peritendinitis around the rotator cuff tendon. (R. at 362.) X-rays of Hayes's lumbar spine taken on May 31, 2006, showed no acute abnormality in his spine. (R. at 371.) X-rays of Hayes's lumbar spine and hips taken on December 4, 2007, showed minimal degenerative changes of the lumbar spine with disc spaces within normal limits and no significant abnormalities of his hips. (R. at 437.) In 2007, Hayes also was diagnosed with depression. (R. at 407.)

Case 2:13-cv-00018-PMS   Document 20   Filed 08/26/14   Page 6 of 33   Pageid#: 743

Frontier Health Case manager Michael Sean Halcomb, B.A., completed an Outpatient Admission – Intake of Hayes on August 3, 2007. (R. at 472-93.) Hayes told Halcomb that he was seeking mental health treatment because his "nerves [were] shot." (R. at 472.) Hayes stated that he could not work due to an injury and that he was seeking disability benefits. (R. at 472.) Hayes said that his wife supported the family, and he felt bad about not being able to work and contribute financially. (R. at 472.) Halcomb noted that Hayes walked slowly. (R. at 472.) Hayes reported that he took two 7.5 mg Lortabs daily for back pain. (R. at 472.) Hayes reported that the financial strain was causing marital difficulties. (R. at 472.) Hayes also reported drinking about 12 beers per week for years. (R. at 472.)

The assessment noted that Hayes reported no involvement in any leisure or recreational activities and stated that he would be encouraged to develop appropriate diversion/leisure activities. (R. at 476.) The assessment stated that Hayes was depressed about his then-current situation and was anxious about fears of losing his home and his health. (R. at 477.) Hayes complained of moderate decrease in energy or fatigue, moderate social withdrawal, moderate anxiety, moderate jitteriness, mild panic attacks, severe worrying, moderate memory impairment, mild racing thoughts, mild hallucinations, mild decreased appetite, mild anger, moderate blunted or flat affect, severe depressed mood, severe feelings of worthlessness, moderate feelings of helplessness and hopelessness, moderate irritability, moderate loss of interest or pleasure, severe low self-esteem, mild insomnia and moderate tearfulness. (R. at 481-83.) Halcomb diagnosed major depressive disorder, single episode, severe, with psychotic features, and he placed

Hayes's then-current Global Assessment of Functioning, ("GAF"), [5] score at 40.[6] (R. at 485.)

Hayes saw Halcomb for individual therapy on September 4, 2007. (R. at 494.) Hayes reported increased feelings of depression and chronic worry over financial problems. (R. at 494.) Halcomb stated that Hayes's mood was depressed, and his affect was flat. (R. at 494.) Halcomb encouraged Hayes to focus on possible solutions to his problems rather than worrying. (R. at 494.)

William J. Hamil, M.Ed., LSPE, performed a psychological evaluation of Hayes on March 15, 2008. (R. at 418-23.) Hayes complained of depression since he had been forced to quit work due to health problems two years previously. (R. at 419.) Hayes told Hamil that he felt "down in the dumps all the time." (R. at 419.) Hayes stated that he avoided people and stayed to himself. (R. at 419.) He stated that he could not handle stress anymore. (R. at 419.) Hayes stated that he suffered from insomnia and could not sleep without medicine. (R. at 422.) He said he felt worthless. (R. at 422.)

Hayes told Hamil that he withdrew from school in the eleventh grade to go to work. (R. at 419.) Hayes denied ever being in special education classes and reported earning his GED at age 20. (R. at 419.) Hayes stated that he had worked

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32.

27 years as an underground coal miner. (R. at 419.)  Hayes said that he spent most of his days watching television. (R. at 422.)

Hayes reported that he suffered from osteoarthritis, rheumatoid arthritis, hypertension, bone spurs in his back and hips, degenerative disc disease, hemorrhoids and high cholesterol. (R. at 419.) Hayes stated that he had received outpatient mental health treatment at Wise County Behavioral Health Center for the previous year. (R. at 420.)  Hamil found Hayes's affect to be appropriate. (R. at 420.) Hayes denied suicidal or homicidal ideations. (R. at 420.) No hallucinations or delusions were elicited. (R. at 420.)  Hamil stated that Hayes was alert and oriented with intact attention, concentration and short-term memory and adequate insight and judgment. (R. at 420.)

Hamil administered the Weschler Adult Intelligence Scale III, ("WAIS-III"), on which he obtained a verbal IQ score of 89, a performance IQ score of 80 and a full-scale IQ score of 84, placing him in the low average range of intellectual functioning. (R. at 420-21.)  Hamil also administered the Minnesota Multiphasic Personality Inventory 2, ("MMPI-2"), which showed that Hayes was likely to present with chronic pain and complain of being physically ill. (R. at 421.)  He also was likely to tend to worry a great deal, be irritable, anxious, moody, guilt prone, brooding, unhappy and have episodes of depression. (R. at 421.)

Hamil diagnosed Hayes with suffering from a major depressive disorder, single episode, moderate; arthritis; hypertension; degenerative disc disease; hemmorrhoids; and high cholesterol. (R. at 423.) Hamil estimated Hayes's then-

current GAF score at 50.[7] (R. at 423.) Hamil stated that Hayes should be able to comprehend and follow simple and somewhat detailed job instructions and perform simple and repetitive tasks. (R. at 423.) Hamil stated that Hayes's concentration and persistence appeared to be adequate to meet the demands of simple or even detailed work-related decisions. (R. at 423.) Hamil said that Hayes showed a markedly unsatisfactory ability to interact with others, especially to accept instructions from supervisors and interact with co-workers and the public in an appropriate manner, as evidenced by a desire to be alone. (R. at 423.) Hamil also said that Hayes was markedly limited in his ability to deal with the usual stress encountered in competitive work, adapt to changes in the workplace, to be aware of normal hazards or to take appropriate precautions because of stress sensitivity. (R. at 423.) Hamil stated that Hayes's mood and physical problems might markedly detract from his ability to maintain regular attendance, perform work activities on a consistent basis, perform work activities without special/additional supervision and meet an employment schedule such as completing a normal workday/workweek without interruption. (R. at 423.) Hamil recommended continued mental health counseling and medication management by a psychiatrist. (R. at 423.)

Hamil also completed an Assessment Of Ability To Do Work-Related Activities (Mental) on Hayes. (R. at 424-26.) Hamil stated that Hayes had a poor ability to make all occupational, performance and personal-social adjustments except for a good ability to follow work rules, to maintain attention and concentration and to understand, remember and carry out detailed, but not complex, and simple job instructions. (R. at 424-25.) Hamil stated that Hayes

---

[7] A GAF score of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning.

would, on average, be absent more than two days a month due his mental impairments or treatment. (R. at 426.)

Hayes has been treated at Stone Mountain Health Services for complaints of chronic back pain since as early as 2007. (R. at 403-14.) Hayes was seen at Stone Mountain Health Services in Appalachia on March 24, 2008, for a routine checkup. (R. at 427-30.) Hayes stated that amitriptyline had improved his sleep and helped him better cope during the daytime. (R. at 427.) Hayes was diagnosed with chronic low back pain, hypertension, depression, insomnia and elevated triglycerides. (R. at 429.)

Case manager James Dale Kegley, M.S., with Frontier Health, completed an Outpatient Admission – Intake of Hayes on March 25, 2008. (R. at 438-64.) Hayes told Kegley that he suffered from back problems, including degenerative disc disease and bone spurs, which caused him constant pain in his back and hips. (R. at 458.) Hayes complained of depression due to being unable to work for about two years due to his physical problems. (R. at 438.) Hayes said that his back gradually got worse, forcing him to quit work as shuttle car operator in an underground coal mine. (R. at 438.) Hayes said he had applied for disability and been denied twice. (R. at 438.)

The assessment noted that Hayes reported no involvement in any leisure or recreational activities and stated that he would be encouraged to develop appropriate diversion/leisure activities. (R. at 442.) Hayes also reported that he had difficulty in establishing or maintaining a personal social support system outside of his family. (R. at 442.) Hayes stated that he was able to complete all activities of daily living and independent living without intervention. (R. at 443.) Hayes

complained of moderate decrease in energy or fatigue, mild social withdrawal, moderate apathy, moderate depressed mood, moderate feelings of worthlessness, helplessness and hopelessness, mild irritability, moderate loss of interest or pleasure, moderate low self-esteem and mild tearfulness. (R. at 447-49.) Kegley diagnosed adjustment disorder with depressed mood, and he placed Hayes's then-current GAF score at 50. (R. at 451.) Kegley recommended that Hayes participate in individual and group psychotherapy. (R. at 454.)

Hayes began individual therapy with Kegley on April 14, 2008. (R. at 467.) Hayes told Kegley that his life "started going downhill" when he had to stop working about two years previously. (R. at 467.) Hayes said that what bothered him most was "not being able to do what I had been doing." (R. at 467.) Hayes said that it bothered him that he could not take care of his family (R. at 467.) Kegley stated that Hayes's mood was mildly depressed with congruent affect. (R. at 467.) Kegley stated that Hayes moved continuously throughout the session as if in physical pain. (R. at 467.)

Hayes saw Kegley again on April 29, 2008. (R. at 466.) Hayes said that he was "just wore out" physically. (R. at 466.) Hayes stated that he and his wife were getting behind in their bills and were barely able to make their house payment each month. (R. at 466.) Hayes said he was troubled because he believed that he should be the primary wage earner in the house rather than his wife. (R. at 466.) Hayes stated that he missed work. (R. at 466.) Kegley stated that Hayes was moderately depressed and moved frequently throughout the session as if in physical discomfort. (R. at 466.)

It appears that after receiving records from Kegley on May 1, 2008, to assist in his disability claim, Hayes did not return for any additional therapy. Hayes was discharged based on this failure to attend further sessions on July 16, 2008. (R. at 499-508.)

Hayes saw Misty L. Bendall, F.N.P., at Stone Mountain Health Services Appalachia Family Health Center, on October 20, 2008. (R. at 536-37.) Hayes stated that he was doing fairly well, but had experienced chest pain two weeks previously at rest. (R. at 536.) Hayes stated that he became short of breath, nauseated and had pain going down his left arm. (R. at 536.) He also complained of a cyst on his right inner knee. (R. at 536.) Bendall noted no tenderness in Hayes's lumbosacral spine on palpation. (R. at 536.) Bendall recommended a referral to a cardiologist. (R. at 536.) As a result of cholesterol testing, Bendall recommended a low cholesterol diet and increased exercise. (R. at 538.)

An MRI of Hayes's lumbar spine taken on November 24, 2008, showed good disc space preservation with no focal disc protrusions, extrusions or herniations. (R. at 511-12.) Vertebral alignment was normal. (R. at 511.) Very nominal anterior spondylitic lipping was noted, but otherwise the findings were normal. (R. at 512.) Hayes had a adenosine stress myocardial perfusion scan performed on November 25, 2008. (R. at 548-50.) This scan showed no evidence of focal fixed or reversible ischemia and normal left ventricular ejection fraction. (R. at 549.)

Dr. William Humphries, M.D., performed a consultative examination on Hayes at the request of the state agency on December 30, 2008. (R. at 515-18.) Hayes told Dr. Humphries that he had experienced constant pain in his back and

hips for the previous five or six years. (R. at 515.)  Hayes stated that he did not recall any specific injury. (R. at 515.) He said the pain was exacerbated by standing, walking, bending, lifting or any use of his back. (R. at 515.)  Hayes stated that, on a good day, he could walk about one-quarter of a mile on level ground without stopping. (R. at 515.) Hayes stated that he had occasional urinary and fecal leaks, had severe hemorrhoid problems and occasionally had to disimpact himself. (R. at 515.)

Hayes also complained of chest pain for the previous year. (R. at 515.) Hayes stated that the pain was a knifelike sharp feeling in the upper left parasternal region that would come and go. (R. at 515.) He stated that deep inspiration, movement of the chest and upper extremities and exertion occasionally would cause the pain to appear. (R. at 515.) Hayes also complained of increasing shortness of breath over the previous four to five years, primarily on exertion. (R. at  515.) Hayes also stated that he has experienced pain in his hand, knees, elbows and shoulders intermittently for the previous five or six years. (R. at 516.)

Dr. Humphries noted that Hayes was alert and in no distress, answered questions appropriately and related well to him. (R. at 516.) Dr. Humphries noted that the range of motion in Hayes's neck was slightly reduced with mild tenderness to palpation of the base posteriorly of the cervical spine and the medial trapezius musculature. (R at 516.)  Dr. Humphries noted that the range of motion in Hayes's back was moderately reduced with mild dorsal kyphosis.  (R. at 516.)   There was no scoliosis and no paravertebral muscle spasm.   (R. at 516.)   There was tendernesss to palpation of the paraspinous muscles in the thoracic and lumbar regions. (R. at 516.) Straight leg raise caused lumbar and hip discomfort bilaterally at about 80 degrees in the sitting position. (R. at 516.) There was full range of

motion in both shoulders, elbows and wrists without significant tenderness, heat, swelling or deformity. (R. at 517.) There was slightly reduced range of motion of both hands and some mild synovial thickening of some of the MCP and IP joints of the fingers of both hands. (R. at 517.) There was slightly reduced range of motion in both hips with normal range of motion in both knees and ankles without significant tenderness, heat, swelling or deformity except for mild synovial thickening of some of the IP joints of the toes of both feet. (R. at 517.)

Dr. Humphries noted that Hayes got on and off of the examining table without difficulty, but did guard his back movement. (R. at 517.) His grip strength was 5/5 bilaterally, and radial, median and ulnar nerve functions were intact bilaterally. (R. at 517.) No tremors or involuntary movements except occasional tremor of outstretched hands on intention. (R. at 517.) Romberg's sign was negative. (R. at 517.) Fine manipulations were performed adequately bilaterally, and Hayes's gait was mildly antalgic on the left due to left hip and low back discomfort. (R. at 517.) Muscle strength was within normal limits in all four extremities. (R. at 517.) There was no specific motor or sensory loss in Hayes's extremities. (R. at 517.)

Dr. Humphries noted slightly diminished breath sounds in Hayes's lungs bilaterally, with no rales, wheezes or rhonchi. (R. at 517.) He also noted a slight increase in diameter of the chest. (R. at 517.) Dr. Humphries noted a regular heart rhythm without murmur, gallop or rubs and no peripheral edema. (R. at 517.) The lower extremities reveal no significant venous stasis changes with adequate foot perfusion bilaterally. (R. at 517.) Dr. Humphries did note that Hayes's dorsalis pedis pulses were thready on the left. (R. at 517.)

Dr. Humphries noted that Hayes was alert and oriented with intact memory for recent and remote events. (R. at 518.) He stated that Hayes's intelligence was within the normal range and that his affect and grooming were appropriate. (R. at 518.) X-rays of Hayes's hips taken the same day showed no bony, joint or soft tissue abnormality. (R at 520.) X-rays of Hayes's lumbar spine showed moderate atherosclerosis. (R. at 521.)

Dr. Humphries diagnosed chronic thoracic/lumbar strain; atypical chest pain; COPD, mild to moderate; and degenerative joint disease in both hands and feet and possibly the knees, elbows and shoulders. (R. at 518.) Dr. Humphries stated that, based on his objective findings, Hayes would be limited to sitting six hours in and eight-hour workday, standing and walking six hours in an eight-hour workday and lifting items weighing up to 10 pounds frequently and 25 pounds occasionally. (R. at 518.) He stated that Hayes was limited to only occasional climbing, kneeling or crawling with no restriction on stooping or crouching. (R. at 518.) Dr. Humphries stated that Hayes should avoid heights, hazards and fumes and could not perform repetitive production type of gripping and grasping with either upper extremity. (R. at 518.)

Hayes had pulmonary function testing performed at Johnston Memorial Hospital on January 26, 2009. (R. at 523-25.)

Hayes returned to see Bendall on January 26, 2009, complaining of chest pain three to four times a week at varying times. (R. at 540-41.) Hayes reported that he had undergone an MRI of his back, seen a cardiologist and had a stress test performed, but he did not know the results of any of this testing. (R. at 540.) Hayes asked to increase his dosage of Lortab, stating that he was taking three to

four a day. (R. at 540.)  Bendall did note tenderness in Hayes's lumbosacral spine on palpation. (R. at 540.)

State agency physician Dr. Richard Surrusco, M.D., completed a Residual Functional Capacity Assessment on Hayes on February 4, 2009. (R. at 89-91.)[8] Based on his review of the medical evidence, Dr. Surrusco stated that Hayes could frequently lift and carry items weighing up to 10 pounds and occasionally lift and carry items weighing up to 20 pounds. (R. at 89.)  Dr. Surrusco stated that Hayes could stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 89.)  He stated that Hayes's ability to push and/or pull was limited only by his lift and carry restrictions. (R. at 89.) Dr. Surrusco stated that Hayes could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, kneel and crawl. (R. at 89-90.) He stated that Hayes's abilities to stoop and to crouch were unlimited. (R. at 90.) Dr. Surrusco also stated that Hayes should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights. (R. at 91.)

State agency psychologist Joseph Leizer, Ph.D., completed a Psychiatric Review Technique, ("PRT"), on Hayes on February 4, 2009. (R. at 86-87.)[9] Joseph Leizer stated that Hayes suffered from an affective disorder which resulted in mild restrictions of activities of daily living, mild difficulties in maintaining

---

[8]  The only evidence of this contained in the Administrative Record is the summary contained in the Disability Determination Explanation. (R. at 80-94.)

[9]  The only evidence of this contained in the Administrative Record is the summary contained in the Disability Determination Explanation. (R. at 80-94.)

social functioning, mild difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 87.)

Hayes saw Bendall again on April 27, 2009, complaining of a chest cold. (R. at 542-43.) Bendall ordered a chest X-ray to rule out pneumonia and gave Hayes a prescription for an antibiotic. (R. at 542.) Bendall also recommended that Hayes start using an Advair inhaler. (R. at 543.) On August 20, 2009, Hayes reported that he was doing well and that his medication had his pain down to a tolerable level. (R. at 544.)

State agency psychologist Howard S. Leizer, Ph.D., completed a PRT on Hayes on October 14, 2009. (R. at 103-04, 116-17.)[10] Howard S. Leizer stated that Hayes suffered from an affective disorder which resulted in mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 116.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a consultative evaluation on Hayes on December 1, 2009. (R. at 559-68.) Hayes told Lanthorn that he could not do much due to pain in his back and hips, which had worsened over the years. (R. at 560, 562.) Hayes told Lanthorn that his pain level was an 8/9 on a 10-point scale on bad days and a 5/6 on good days. (R. at 562.) Hayes stated that, on occasion, he would help do the laundry and do some light housekeeping at home. (R. at 563.) Hayes gave a history of being seen at Wise

---

[10] The only evidence of this contained in the Administrative Record is the summary contained in the Disability Determination Explanation. (R. at 97-109, 110-22.)

County Behavioral Health Services by Kegley and by Crystal Burke, L.C.S.W., at Stone Mountain Health Services for mental health therapy. (R. at 563.)

Lanthorn noted that Hayes was oriented, exhibited poor eye contact, and his affect was flat and blunted. (R. at 561, 564.)  He stated that Hayes walked stiffly and moved about his chair frequently during the interview. (R. at 563.) Lanthorn described Hayes's mood as agitated depression and stated that he seemed tense and on-edge. (R. at 564.)  Lanthorn stated that Hayes exhibited no signs of ongoing psychotic processes or any clinical indicators of delusional thinking.  (R.at 564.) Hayes denied ever having any hallucinations. (R. at 564.)  Hayes said that he was quite depressed, preferred to be alone and was often irritable. (R. at 564.)  Hayes said that his energy level was low and that he did not enjoy anything. (R. at 564.) Hayes claimed to have significant problems with his concentration and short-term memory. (R. at 564.)  After 10 minutes, however, Hayes was able to recall four out of five words presented to him earlier. (R. at 564.) Hayes said that he was often anxious, on-edge, tense, fidgety, restless, shaky and jittery. (R. at 564.)

Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), and the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2").  (R. at 564-67.) Hayes had a verbal comprehension index score of 74, a perceptual reasoning index score of 81, a working memory index score of 80, a processing speed index score of 68 and a full-scale IQ score of 71. (R. at 564-65.) Lanthorn stated that these scores placed Hayes in the borderline range of intelligence. (R. at 564.) Lanthorn stated that Hayes gave a good effort and that he thought these results were valid. (R. at 564.)  Lanthorn stated that Hayes's MMPI-2 test results suggested that he lacked psychological insight and had a tendency to repress or deny problems and unfavorable traits. (R. at 566.)   According to

Lanthorn, these test results also showed that Hayes was markedly depressed, unhealthy, pessimistic about his future, felt inadequate, hopeless and lacked self-confidence. (R. at 566.) The test results indicated that Hayes experienced confused thinking, difficulties with logic and concentration and impaired judgment. (R. at 566.)

Lanthorn diagnosed Hayes as suffering from a major depressive disorder, single episode, severe; anxiety disorder with generalized anxiety due to chronic physical problems, pain, etc.; pain disorder associated with both psychological factors and general medical conditions, chronic; and borderline intellectual functioning. (R. at 567.) Lanthorn placed Hayes's then-current GAF score at 50-55.[11] (R. at 567.) Lanthorn stated that, from a psychological point of view, Hayes's prognosis was guarded. (R. at 568.) He recommended that Hayes return to both psychiatric and psychotherapeutic intervention at his local mental health center. (R. at 568.)

Lanthorn stated that Hayes was severely depressed with anhedonia, low-energy level, erratic to poor short-term memory and concentration, disrupted sleep pattern and poor appetite. (R. at 568.) Lanthorn stated that Hayes had mild limitations on learning simple tasks in the workplace and mild to moderate limitations on his ability to learn and perform more complicated tasks. (R. at 568.) He stated that Hayes would have mild to moderate limitations in focusing his concentration and persisting on task. (R. at 568.) Lanthorn stated that Hayes would have moderate or greater limitations on interacting with others in the

_____

[11] A GAF score of 51-60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* DSM-IV at 32.

workplace to include co-workers, the public and supervisors and in dealing with the changes and requirements of the workplace. (R. at 568.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), on which he stated that Hayes had poor to no ability to make all occupational, performance and personal-social adjustments other than a fair ability to follow work rules, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 570-72.) He also stated that Hayes would, on average, be absent from work more than two days a month due to his impairments and/or treatment. (R. at 572.)

Hayes returned to see Bendall on February 22, 2010. (R. at 576-77.) Hayes stated that he was doing fairly well and had come in simply to receive refills on his medications. (R. at 576.) Bendall recommended a referral for an ultrasound of his abdomen. (R. at 577.)

On March 11, 2010, Bendall completed an assessment of Hayes's work-related physical abilities. (R. at 578-80.) On this assessment, Bendall stated that Hayes could lift and carry items weighing up to 10 pounds. (R. at 578.) She stated that Hayes could stand and walk up to 45 minutes and sit up to 45 minutes in an eight-hour workday. (R. at 578.) Bendall stated that Hayes could never climb, stoop, kneel, balance, crouch or crawl. (R. at 579.) She also stated that Hayes's abilities to reach, to handle and to push or pull were affected by his impairments. (R. at 579.) Bendall said that Hayes should avoid work around heights, moving machinery, dust, fumes, humidity and vibration. (R. at 580.) Bendall also stated

that Hayes was likely to miss more than two days of work a month due to his impairments and/or treatment. (R. at 580.)

Hayes saw Crystal Burke, LCSW, with Stone Mountain Health Services, on March 29, 2010, for a behavioral health consult. (R. at 583-84.) Hayes told Burke that he was injured at work and was placed on workers' compensation. (R. at 583.) He later was returned to light-duty work, but there was no light-duty work available in the coal mines, so he lost his job. (R. at 583.) He stated that he had not worked in about four years and that he was very depressed. (R. at 583.) He reported an increase in stress over the previous few weeks, as his wife also lost her job. (R. at 583.)

Hayes told Burke that he was in quite a bit of pain and took Lortab 10 mg four times a day. (R. at 583.) He said that he also took amitriptyline 50 mg at night which helped very little with sleep. (R. at 583.) Hayes stated that he was no longer interested in any activities and mostly sat at home watching television. (R at 583.) Burke noted that Hayes responded appropriately to questions, but he initiated very little conversation. (R. at 583.) She noted that Hayes's mood appeared depressed with congruent effect. (R. at 583.) Burke stated that Hayes might benefit from further antidepressant treatment. (R. at 583.)

Hayes was seen for an initial visit at the Davenport Clinic of Stone Mountain Health Services on June 2, 2010. (R. at 606-08.) Hayes reported that his chronic lumbar pain was well-controlled with medication. (R. at 606.) The only abnormality noted on physical exam was a slightly antalgic gait. (R. at 607.) Hayes was advised to decrease his dosage of Lortab. (R. at 608.) The provider

advised Hayes to seek a primary care physician because the provider was not taking any chronic pain patients. (R. at 608.)

On July 14, 2010, Hayes sought treatment again at Stone Mountain Health Services in Appalachia and began treating with Dr. T. Kaur, M.D. (R. at 626-28.) Hayes stated that he returned to Appalachia for treatment because the provider at the St. Paul clinic had decreased his pain medication and told him that the provider would not write him a continuing prescription for pain medication. (R. at 626.) Hayes stated that he had no interest in receiving epidural injections for his back pain. (R. at 626.) Hayes complained of shortness of breath, wheezing, sharp chest pain with breathing and chronic back pain. (R. at 626.) Examination revealed high blood pressure, wheezing in Hayes's upper right lung lobe and decreased range of motion in his lumbar spine. (R. at 627.) Dr. Kaur returned Hayes's Lortab 10 mg dosage to four times a day. (R. at 628.)

Hayes returned to Dr. Kaur on August 13, 2010, stating that he needed a refill of his Lortab prescription. (R. at 623-25.) On September 13, 2010, Hayes also was given a prescription for Mobic for his chronic back pain. (R. at 622.) On October 13, 2010, Hayes complained that his pain was so severe that he could not sit still. (R. at 617.) Hayes also complained of urinary complaints this date, including poor stream, imcomplete emptying and increased frequency of urination. (R. at 617.) Hayes returned on November 16, 2010, stating that he needed refills on his medications. (R. at 614-16.)

Hayes returned to see Burke on January 19, 2011. (R. at 630.) Hayes complained of being unable to work with multiple frustrations due to financial stressors. (R. at 630.) Hayes stated that his utilities had been stopped on more than

one occasion over the previous few months, and he was about to lose him home. (R. at 630.) Hayes reported a "falling out" with his son because his son was helping him financially and it placed too large a strain on the son's family. (R. at 630.) Hayes reported feelings of hopelessness and worthlessness. (R. at 630.) He denied suicidal ideation, but reported that he often felt he would be better off dead. (R. at 630.) Burke noted that Hayes's mood was significantly depressed with congruent affect. (R. at 630.) Burke stated that Hayes's symptoms of depression appeared worse. (R. at 630.) Burke again encouraged Hayes to seek antidepressant medication. (R. at 630.)

Burke completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on January 24, 2011. (R. at 632-34.) Burke stated that Hayes had a poor or no ability to make all occupational, performance and personal-social adjustments with the exception of a fair ability to understand, remember and carry out simple job instructions, to relate predictably in social situations and to demonstrate reliability. (R. at 632-33.) Burke stated that, on average, Hayes would miss more than two days of work a month due to his impairments or treatment. (R. at 634.)

Hayes saw Burke again on February 14, 2011. (R. at 648.) Hayes complained of pain and anxiety. (R. at 648.) Hayes reported that he mostly stayed to himself, even avoiding his family. (R. at 648.) He stated that he felt irritable all of the time. (R. at 648.) Burke reported that Hayes was very quiet, almost timid during the interview, tearful and depressed. (R. at 648.)

Edward E. Latham, Ph.D., a clinical psychologist, performed a psychological evaluation on Hayes on March 17, 2011. (R. at 636-38.) Hayes

reported that he worked until five years earlier when physical problems prevented him from working in the coal mines. (R. at 636.) Hayes told Latham that he was disabled due to arthritis and degenerative bone disease in his back and hips, breathing problems and hemorrhoids. (R. at 636.) Hayes reported that he had sought mental health treatment in the past and currently was treating with Burke. (R. at 637.) Hayes reported little daily activity other than sitting and watching television. (R. at 637.)

Hayes reported reduced will, motivation and pervasive loss of interest in activities. (R. at 637.) He also reported fatigue, low energy, feelings of guilt and uselessness, short-term memory and concentration deficits and sleep disturbance. (R. at 637.) Hayes reported suicidal ideations, but no attempts or plans. (R. at 637.) He denied any psychotic experiences, hallucinations or delusions. (R. at 637.) Latham stated that Hayes presented no symptoms of bipolar disorder. (R. at 637.) Hayes denied any periods of excessive restlessness and activity, racing thoughts, elevated mood for no reason, decreased need for sleep while feeling energized or involvement in high-risk activity. (R. at 637.)

Hayes reported some anxiety and complained of being jumpy, easily startled and hypervigilant. (R. at 637.) He stated that he avoided shopping and crowds out of distress. (R. at 637.) Hayes stated that he had experienced panic-like episodes, but could not say that they occurred once a week. (R. at 637.) Hayes denied any obsessive or compulsive actions or any symptoms of post-traumatic stress disorder. (R. at 637.)

Latham stated that Hayes was alert and adequately oriented with no pathological disturbance in thought processes, content or perception. (R. at 637.)

Latham noted that Hayes's mood was depressed, and his affect was appropriate with respect to his thought content. (R. at 637.) Latham noted that Hayes's cognitive abilities appeared to be low average to possibly borderline deficient. (R. at 637.) Latham administered a self-report personality inventory, but he reported that the results were invalid. (R. at 638.)

Latham diagnosed Hayes as suffering from major depression, single episode, severe, without psychosis; and an anxiety disorder, not otherwise specified. (R. at 638.) Latham stated that Hayes was able to understand, retain and follow simple instructions and do routine, repetitive tasks. (R. at 638.) He stated that Hayes's attention/concentration skills appeared to be impaired, but sufficient, for simple tasks. (R at 638.) Latham stated that Hayes's ability to relate interpersonally appeared moderately impaired. (R. at 638.) He stated that Hayes's ability to handle everyday stressors appeared to be markedly impaired. (R. at 638.)

Latham also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), on which he stated that Hayes had mild limitations in his ability to understand, remember and carry out simple instructions and to make judgments on simple work-related decisions, moderate limitations in his ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions and to interact appropriately with the public, supervisors and co-workers and marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 639-41.) Latham stated that Hayes described credible depression symptoms, avoidance pattern and withdrawal. (R. at 640.)

Hayes returned to Stone Mountain Health Services in Appalachia on July 11, 2011, complaining of chest pain, racing heart rate and insomnia. (R. at 656.) Dr. Kaur prescribed Elavil, in addition to Lortab. (R. at 656.) On September 26, 2011, Hayes told Dr. Kaur that he drank two beers a day and denied any withdrawal symptoms or cravings. (R. at 650.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir.

-27-

1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 30, 2011, the ALJ denied Hayes's claims. (R. at 14-26.) The ALJ found that Hayes met the disability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 17.) The ALJ found that Hayes had not engaged in substantial gainful activity since July 26, 2008. (R. at 17.) The ALJ found that the medical evidence established that Hayes had severe impairments, namely degenerative disc disease, degenerative joint disease, COPD, major depressive disorder, borderline intellectual functioning and anxiety disorder, but the ALJ found that Hayes did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.) The ALJ found that Hayes had the residual functional capacity to perform simple, unskilled light work that required no concentrated exposure to fumes, odors, gases, dust and poor ventilation, no exposure to hazards, only superficial contact with others and low-stress work, which was defined as no high production quotas or strict time demands for production. (R. at 19-25.) The ALJ found that Hayes was unable to perform any of his past relevant work. (R. at 25.) Based on Hayes's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Hayes could perform, including jobs as a cleaner, a mail clerk, a packer and a counter clerk. (R. at 25-26.) Thus, the ALJ concluded that Hayes was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

In his brief, Hayes argues that the ALJ's finding as to his residual functional capacity is not supported by the substantial evidence of record. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Hayes also argues that the ALJ erred by failing to give full consideration to the opinions of Lanthorn. (Plaintiff's Brief at 9-11.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975.) Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, there is little objective evidence to support Hayes's allegations of severe debilitating pain. While Hayes has treated with Stone Mountain Health Services for years, it appears that these providers have done little by way of physical examinations to confirm his complaints of back and hip pain. The medical records of these visits make little mention of any physical examination other than tenderness in the low back to palpation – a subjective complaint, rather than objective finding. The records make no mention of range of motion testing, straight leg raise testing or any muscle spasms or atrophy.

Dr. Humphries, on the other hand, performed range of motion testing in all major joints, noting that the range of motion in Hayes's neck was slightly reduced, and the range of motion in Hayes's back was moderately reduced. (R. at 516-17.) While Dr. Humphries noted mild tenderness to palpation of the base posteriorly of the cervical spine and tendernesss to palpation of the paraspinous muscles in the thoracic and lumbar regions, he noted no muscle spasm. (R at 516.) Straight leg raise caused lumbar and hip discomfort bilaterally at about 80 degrees in the sitting position. (R. at 516.) There was slightly reduced range of motion in both hips with

normal range of motion in both knees and ankles without significant tenderness, heat, swelling or deformity. (R. at 517.) There was full range of motion without significant tenderness, heat, swelling or deformity in all other joints, other than Hayes's hands and feet. (R. at 517.)

Dr. Humphries noted that Hayes was in no distress and got on and off of the examining table without difficulty, but did guard his back movement. (R. at 516-17.) His grip strength was 5/5 bilaterally, and radial, median and ulnar nerve functions were intact bilaterally. (R. at 517.) Dr. Humphries also noted that Hayes's muscle strength was within normal limits in all four extremities. (R. at 517.) There was no specific motor or sensory loss in Hayes's extremities. (R. at 517.) X-rays of Hayes's hips taken the same day showed no bony, joint or soft tissue abnormality. (R at 520.) X-rays of Hayes's lumbar spine showed moderate atherosclerosis. (R. at 521.)

Based on his objective findings, Dr. Humphries stated that Hayes would be limited to sitting six hours in an eight-hour workday, standing and walking six hours in an eight-hour workday and lifting items weighing up to 10 pounds frequently and 25 pounds occasionally. (R. at 518.) He stated that Hayes was limited to only occasional climbing, kneeling or crawling with no restriction on stooping or crouching. (R. at 518.) Dr. Humphries stated that Hayes should avoid heights, hazards and fumes and could not perform repetitive production type of gripping and grasping with either upper extremity. (R. at 518.)

Based on the above, I find that the ALJ's decision to give more weight to the opinion of Dr. Humphries is supported by the evidence of record. I also find that

Dr. Humphries's opinions support the ALJ's finding as to Hayes's physical residual functional capacity.

Regarding Hayes's mental impairments, the ALJ gave more weight to the opinion of psychologist Latham. Again, I find that this weighing of the psychological evidence is supported by the evidence of record. Despite allegations of disabling psychological problems, it appears that Hayes has not consistently sought psychological treatment. While Hayes has treated with antidepressant medication, he has never consulted a psychiatrist with this regard. This may be due to the fact that Hayes reported to his treating physician that the medication prescribed helped with his symptoms. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Also, a review of Latham's and Lanthorn's opinions show that they are fairly consistent. Lanthorn, however, placed more severe restrictions on Hayes's work-related mental abilities due in part to Hayes's subjective complaints of disabling pain. In fact, Lanthorn diagnosed Hayes as suffering from a pain disorder associated with psychological factors and general medical conditions. (R. at 567.) As stated above, the ALJ's weighing of the medical evidence as to Hayes's complaints of disabling pain and its effect on his work-related physical abilities is supported by the record. That being the case, the ALJ's decision with regard to the weighing of the psychological evidence also is supported, in that the ALJ's weighing of the psychological evidence was dependent, at least in part, on his rejection of Hayes's subjective complaints of disabling pain.

Based on the above-stated reasons, I find that substantial evidence supports the Commissioner's decision to deny benefits. An appropriate order will be entered.

ENTERED:  This 26th day of August, 2014.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE